Leonard H. Sandler, J.
The plaintiff sues the two defendants for $4,483.14, a sum of money removed by the Chemical Bank New York Trust Company (“Chemical”) on or about December 8, 1966 from a savings account that had been opened by the plaintiff some six weeks previously. This new account had been opened by plaintiff, a long-time depositor at Chemical, with a teller’s check of Washington Heights Federal Savings and Loan Association (“ Washington ”) to the plaintiff’s order in the amount stated above. The Washington teller’s check in turn represented the balance in a savings account at Washington in the name of Helen Bell, but which plaintiff contends, and the evidence establishes, was in fact plaintiff’s own money held by Helen Bell for her account.
Three causes of action are set forth against the two defendants. The first, directed against Chemical, asserts that Chemical wrongfully and without written authority debited her account for the full balance, closing it out and depriving her of $4,483.14. The second cause of action, directed against Washington, states that Washington induced Chemical to appropriate the above amount from the plaintiff. The third cause of action, also directed against Washington, claims that Washington wrongfully ordered a ‘ ‘ stop payment ” on a check that had already cleared Chemical and had been credited to plaintiff’s savings account. Cross claims were asserted by the two defendants against each other, but these have been settled between them and I have been requested not to consider them.
As to the two causes of action against Washington, the evidence clearly fails to sustain them, and they must accordingly be dismissed.
The critical factual and legal issues are raised by plaintiff’s cause of action against Chemical.
*426 The facts culminating in that cause of action are of exceptional human interest. The questions of law include novel and unusual issues of statutory interpretation under articles 3 and 4 of the Uniform Commercial Code. However, the most significant aspect of the case to this court has been the substantial question it raises as to the nature of a bank’s obligation to deal fairly with a depositor when events cast them in an adversary relationship.
At all relevant times Helen Bell had been married to plaintiff’s brother. During plaintiff’s marriage to an army officer, which required her to live abroad from time to time, she and Helen Bell had agreed that the latter would manage her small properties and maintain the plaintiff’s money in a savings account at Washington under Helen Bell’s name. Mrs. Bell was experienced in business, plaintiff was not, and plaintiff trusted her and relied on her superior understanding of such matters.
After plaintiff’s return to this country following a separation from her then husband, the same arrangement continued. For some years leading up to October, 1966, the plaintiff, her brother and Helen Bell lived together in the same house.
Some weeks before October 13, 1966, the plaintiff requested and received from Mrs. Bell the passbook to the Washington savings account and withdrawal slips signed by Helen Bell. On October 13, 1966, plaintiff presented to Washington the passbook and a withdrawal slip, made out for the balance in the account, and received from Washington a teller’s check payable to the order of “ Mrs. Catherine Wells ” drawn to Washington’s account at Chemical. Plaintiff testified, and no contrary evidence was presented, that she informed the Washington teller of her ownership of the money in the account.
Plaintiff, who had maintained a savings account at Chemical, where Washington coincidentally maintained its account, went to Chemical on October 20, 1966, and opened a new account with the teller’s check received from Washington.
Unknown to plaintiff, Helen Bell on October 11, 1966 had written a letter to Washington purporting to alert it to a possible unauthorized withdrawal of funds from the savings account in the future, and directing it not to permit a withdrawal by anyone other than herself. This letter was allegedly received on October 13, 1966 after the issuance of the teller’s check to the plaintiff. Washington promptly notified Mrs. Bell of the withdrawal. She appeared at Washington on the afternoon of the same day and requested Washington to stop payment on the teller’s check, which it undertook to do by placing a stop payment instruction on the check with Chemical. That evening *427 Helen. Bell did not return to the house she and her husband had shared with the plaintiff and she never returned thereafter.
Although Chemical admittedly received the stop payment instruction, it nonetheless cleared the check and credited the proceeds to plaintiff’s new account. The error was not discovered by Chemical until the end of October or early November, at which time it apparently saw no pressing need to alert Washington to what had happened.
On November 14, 1966, allegedly acting on the assumption that payment had been stopped, Washington paid the amount of the check to Helen Bell in cash, through the device of issuing a duplicate check which she marked as ‘ ‘ not used for the purpose intended ”, and then cashed. Subsequently, Helen Bell left this area and secured a divorce. Her present whereabouts are unknown.
Early in December, about a month after the discovery of the clerical error, a Mr. Weigel at Chemical was informed that Washington was demanding reimbursement. His instructions were to interview the plaintiff and seek permission to charge back the item against her account. After the interview, which will be discussed later, the plaintiff did redeposit in the account the $300 she had previously withdrawn, whereupon Chemical debited the entire amount and closed the account.
Analysis of most of the principal legal issues will be facilitated by setting forth first my factual findings on two fundamental issues, together with my view of how Chemical discharged its duty to be fair to depositor wholly without business experience.
First, I find that the Washington account was in fact the account of the plaintiff, that the money in it was her money, and that Helen Bell held the money for her benefit.
Second, I find that plaintiff did not consent to the debiting of her account and the removal of her money. The suggestion that Mrs. Wells voluntarily agreed to give up $4,483.14 to Chemical in the very conversation in which she spelled out her ownership of the money is preposterous on its face. The most that could be said for Chemical is that the plaintiff was given to understand that an issue of ownership had been raised which could best be resolved by the bank after the account was restored to its original sum and after certain other technical adjustments were made.
Even if I found that plaintiff had given some kind of technical “ consent” to Chemical’s removal of her funds I would be required to set the consent aside as nugatory and without legal effect. Hnder the circumstances presented, the ‘1 consent ’ ’ would have been the result of unconscionable overreaching by an *428 experienced bank official in dealing with a woman unsophisticated in business and banking practices, who had every right to rely on the bank and its officials for fair and honorable dealing.
Chemical was aware that there was a major conflict between it and the plaintiff with regard to the money then in her account. From her statement of the facts concerning the Washington account, Chemical must have recognized the strong possibility that this long-time depositor was acting in good faith, and that the money in question was -in fact her money.
Surely the very least that was required of Chemical was an absolutely candid statement of the situation, alerting Mrs. Wells to their adversary relationship. Obviously this was not done.
Nor does it seem to be extravagant to expect that under the facts a bank official, dealing with such a depositor, should have suggested to her that she consult counsel, before she took any action that would be later used as a waiver of her rights. The single aim that dominated Chemical was to get the money back, and I find that a wholly unacceptable approach under the circumstances.
The remaining j critical legal issues can be most clearly examined by an analysis of the basic argument presented by Chemical. That (argument had three fundamental elements. First, that Washington, after issuance of the teller’s check, had a claim to the funds superior to the plaintiff’s. Second, that Chemical, having 'cleared the check over the stop payment order, was subrogated to Washington’s superior position to the extent necessary to prevent unjust enrichment and to prevent any loss. Third, that if Washington did not have a claim superior to plaintiff’s, plaintiff’s sole recourse would be against Washington, since Chemical merely obeyed Washington’s demand when it debited plaintiff’s account.
Each of these contentions is untenable.
As to Washington’s claim that is alleged to be superior to Mrs. Wells’, and to which Chemical claims to be subrogated, an obvious starting point for analysis is that Washington was under no legal obligation to issue a stop payment order (Uniform Commercial Code, § 4-403). Indeed, in the only case squarely in point, it was persuasively argued that a bank has no legal right to stop payment on its teller’s check except in circumstances not here relevant (Malphrus v. Home Sav. Bank, 44 Misc 2d 705). I do not base my decision on that precedent, because the principle it advances seems less clearly correct to me than others that are made directly applicable by the facts of this ease.
*429 Apart from the Malphrus case (supra), I am aware of no controlling authority, either statutory or decisional, that squarely describes the legal consequences of a stop payment order issued by a financial institution on its own teller’s check where the check had been issued in response to authorization by a depositor and without notice that the authorization had been rescinded.
The best way to approach this problem is, I think, to consider the comparable legal situation, directly covered in section A-407 of the Uniform 'Commercial Code that would have arisen if the teller’s check had been issued after Washington knew of Mrs. Bell’s request that the withdrawal slip not be honored.
In that kind of situation, section 4-407 of the Uniform Commercial Code provides in pertinent part that ‘ ‘ to prevent unjust enrichment and only to the extent necessary to prevent loss to the bank by reason of its payment of the item, the payor bank should be subrogated to the rights * * * (c) of the drawer or maker against the payee or any other holder of the item with respect to the transaction out of which this item arose.” In connection with this section, we must also consider section 4-403 of the Uniform 'Commercial Code, which places on the customer the ‘ ' burden of establishing the fact and amount of loss resulting from the payment of an item contrary to a binding stop payment order.” (See Cicci v. Lincoln Nat. Bank & Trust Co. of Cent. N. Y., 46 Misc 2d 465; Lang v. Chase Manhattan Bank, N. Y. L. J., Dec. 1, 1969, p. 2, col. 5 [App. Term, 1st Dept.].)
Under the suggested analogy, what would have been Helen Bell’s rights to the money as against the plaintiff? The definitive answer is that Helen Bell would have had no right to the money as against the plaintiff — and that Washington would have been subrogated at best to a claim that was a total nullity.
Moreover, the section squarely limits subrogation to the extent necessary “ to prevent unjust enrichment ” and to prevent loss to the bank by reason of its payment of the item. Can it be seriously contended that subrogation is here necessary to prevent the plaintiff from being unjustly enriched through the receipt of her own money? No authority for this startling principle has been advanced — and I doubt that any authority for it exists.
A separate circumstance undermining still further Washington’s position arises from the very substantial question as to whether the payment ultimately made to" Mrs. Bell was necessary— or a loss of the kind contemplated by section A-407.
Approaching the question from a different vantage point, the plain fact is that the plaintiff was truly a holder in due course *430 as that term is defined in section 3-302 of the Uniform Commercial Code and as it is used in section 4-407. Her rights are thus superior to those of all other parties in this matter.
If the above correctly describes the legal consequences had Washington issued the check knowing of Helen Bell’s request, the same conclusions follow a fortiori from the facts actually before me. The only difference is that, since Washington had ignored no instruction when it issued the check, its obigation to protect the “ rights ” of its nominal depositor was much less clear, and the actions it took are open to a more critical scrutiny.
In short, there is no merit to Chemical’s central thesis that Washington had a claim to the money superior to that of the plaintiff.
But even if that thesis were to be credited under some theory difficult to conceive, it would be of little help to Chemical. Chemical would still have to establish that its subrogation to Washington’s rights would “prevent unjust enrichment” and be “ necessary to prevent loss to the bank by reason of its payment of the item.” (Uniform Commercial Code, § 4^407.)
Taking the last phrase first, it is clear that Chemical could sustain loss only if Washington could successfully sue Chemical for a loss resulting from Chemical’s clerical error. In such a suit, as already indicated, Washington would have the burden of “ establishing the fact and amount of loss ”. (Uniform Commercial Code, § A403, subd. [3].)
It is clear for several reasons, which have already been indicated in part, that Washington could not have won in such a lawsuit. One circumstance is that Washington would find it difficult to establish that it suffered a loss from Chemical’s error. Helen Bell had no right to the money, and Washington opened itself to a loss by a payment that was not legally required. Even more decisive is the fact that Chemical did not, and obviously could not, establish that plaintiff had been unjustly enriched.
Apart from the dubiousness of imputing unjust enrichment to someone who merely received her own money, the particular factual pattern here makes it presumptuous indeed for Chemical to claim that plaintiff was unjustly enriched.
When Chemical paid the item over the stop payment direction, it did more than breach a duty to its depositor, Washington. It set in motion a chain of events that effectively prevented the plaintiff from asserting her claim to the money before the November 14 payment of the duplicate check to Helen Bell. *431 Had plaintiff been informed on October 20, 1966 that payment had been stopped, she could immediately have taken action that would have precluded the November 14 payment, (See Banking Law, § 134.)
Moreover, the evidence indicates that the clerical error came to the attention of responsible Chemical officials in late October or early November, 1966, well before the November 14, 1966 payment to Mrs. Bell. Inexplicably, it occurred to no one to call this circumstance to Washington’s attention at a time when it could have stopped the payment to Helen Bell.
Chemical’s response to the discovery of its oversight was one of profound lassitude. No action was taken until early December when the conference described above took place with plaintiff.
Even after Mrs. Wells, a long-time depositor, informed Chemical of her rights to the money under circumstances that must have been persuasive of her truthfulness, no one seemed to think that Washington should be apprised of what was said. Inflexibility in responding to the unusual seems to have been the basic operating rule.
Under the circumstances, the proposition that Chemical’s position must be sustained to prevent the unjust enrichment of Catherine Wells is an audacious one indeed.
The final element of Chemical’s carefully developed argument is that the statutory scheme contemplated the protection of the payee bank, under tho circumstances, and that Chemical merely followed Washington’s orders, as they were required to do, when they debited the Wells account. Accordingly, it is argued that if Washington’s rights were not superior to the plaintiff’s her recourse should be against Washington.
The blunt fact, of course, is that Washington did not direct Chemical to debit plaintiff’s account. Washington merely directed Chemical not to debit its own account. The decision to debit plaintiff’s account was Chemical’s — not its codefendant’s — and Chemical must assume the responsibility for its own actions.
Judgment is to be entered for plaintiff against Chemical for $4,483.14, with costs and interest from December 8,1966. Judgment is to be entered for the defendant Washington on the second and third causes of action, but without costs. The cross claims are deemed withdrawn.